## IN THE COURT OF APPEALS OF THE STATE OF IDAHO

### Docket No. 48690

| | | |
|---|---|---|
| In the Interest of: Jane Doe I, Jane Doe II, and John Doe I, Children Under Eighteen (18) Years of Age. | ) ) ) | |
| STATE OF IDAHO, DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Filed: July 8, 2021 |
| Petitioner-Respondent, | ) ) | Melanie Gagnepain, Clerk |
| v. | ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| JOHN DOE (2021-10), | ) ) | |
| Respondent-Appellant. | ) ) | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Andrew Ellis, Magistrate Judge.

Judgment terminating parental rights, <u>affirmed</u>.

Anthony R. Geddes, Ada County Public Defender; Joshua Mills, Deputy Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Peter Mommer, Deputy Attorney General, Boise, for respondent.

_____

HUSKEY, Chief Judge

John Doe appeals from the magistrate court's judgment terminating his parental rights. John Doe argues that his due process rights were violated when the court recording system malfunctioned and failed to record the last hour of testimony of the termination trial. John Doe further argues the magistrate court erred when it held Doe neglected his children and that it is in the children's best interests to terminate his parental rights. Because John Doe's due process rights were not violated and the record contains substantial and competent evidence to support the magistrate court's findings that John Doe neglected his children and that terminating his parental rights is in the best interests of the children, the magistrate court's judgment terminating John Doe's parental rights is affirmed.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2019, Officer Coils saw a van matching the description of a vehicle associated with a reported burglary in the parking lot of a fast food restaurant. Officer Coils saw John Doe walking from the van to the restaurant and Jane Doe sitting in the front passenger seat. Officer Coils called Detective Canfield, who was investigating the burglary, and other law enforcement officers who responded to the location.

Officer Coils made contact with Jane Doe at the van and saw John and Jane Does' children, S.E., K.E., and J.E., in the back of the van without seatbelts; S.E. was five years old and K.E. and J.E. were four years old. Jane Doe told Officer Coils that the family was on their way to a motel and stopped to get some food. Officer Coils noted that the van was cluttered and Detective Canfield recalled the smell of the van being so overpowering, he "dry heaved."

Officer Coils had Jane Doe and the children exit the van and go inside the restaurant. Officer Coils described the children's behavior inside the restaurant as so chaotic that he had to take a break after thirty minutes.

Detective Canfield interviewed John Doe in the parking lot regarding the burglary investigation. John Doe told Detective Canfield that the family was living in the van with intermittent, short-term stays in various hotels and he admitted to the theft of the items associated with the burglary investigation. Based on his admission to the theft, John Doe was subsequently arrested and placed in Detective Canfield's patrol car.

A drug detection dog was brought to the scene; the dog sniffed around the exterior of the van, and the dog positively alerted. Law enforcement searched the van and found evidence corroborating John Doe's statement that the family was living in the van. The van contained the children's sheets and bedding, a large gasoline container, bags of clothing, open containers of alcohol, and rotting food. Additionally, law enforcement discovered drug paraphernalia in the van, in Jane Doe's purse, and in a red storage box. Some of the paraphernalia contained residue that tested positive for methamphetamine and some contained residue that tested positive for heroin.

John Doe admitted that he owned the bag with the drug paraphernalia and admitted to periodically using heroin. After speaking with John and Jane Doe, John Doe was arrested for felony burglary, felony possession of a controlled substance, and misdemeanor injury to child. Jane Doe was arrested for misdemeanor injury to child. John Doe, Jane Doe, and the children

were transported to the police station where Jane Doe fell asleep and the children continued to exhibit out-of-control behavior. The Department of Health and Welfare (Department) was granted temporary custody of the children and they were placed in foster care. At the time, the children were non-verbal, not toilet trained, beyond control behaviorally, and had unaddressed medical and therapeutic needs.

In December 2019, the magistrate court awarded legal custody of the children to the Department and approved case plans for John Doe and Jane Doe. In October 2020, the magistrate court approved the permanency goal of termination of John Doe's and Jane Doe's rights to the children. In November 2020, the Department petitioned to terminate John Doe's parental rights. Following a trial in 2021, the magistrate court found by clear and convincing evidence that John Doe neglected his children and that termination of John Doe's parental rights is in the best interests of the children. John Doe timely appeals.[1]

## II.

## STANDARD OF REVIEW

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

---

[1]     Jane Doe's parental rights were also terminated. Jane Doe filed a separate appeal from the order terminating her parental rights.

## ANALYSIS

John Doe asserts that his due process rights were violated when the magistrate court's recording system malfunctioned and failed to record the last hour of testimony of the termination trial. John Doe also asserts the magistrate court abused its discretion by finding he neglected his children and by failing to apply the correct legal standards when it held that termination of John Doe's parental rights is in the best interests of the children.

**A.      John Doe Did Not Establish a Violation of His Due Process Rights**

John Doe asserts that his due process rights were violated when the magistrate court's recording system malfunctioned and did not record the last hour of testimony of the termination trial. John Doe further contends that because there is no transcript, there is not an adequate record for him to challenge the magistrate court's findings of fact. The State contends that John Doe's due process rights were not violated because the record is more than sufficient for his purposes on appeal.

John Doe relies, in part, on the Idaho Supreme Court's decision in *Ebersole v. State*, 91 Idaho 630, 428 P.2d 947 (1967). Ebersole filed a habeas corpus petition challenging whether he had waived his right to counsel at the arraignment in the underlying criminal case. *Id.* at 631-32, 428 P.2d at 948-49. At his arraignment, Ebersole was alleged to have waived the right to counsel and entered a valid guilty plea, but there was no court reporter or court clerk present and as a result, there were no minutes, recording, or transcript of the proceeding. *Id*. at 631, 428 P.2d at 948. The district court judge that presided over the criminal case testified in the habeas corpus case that he advised Ebersole of his right to counsel and Ebersole indicated that he did not want to be represented by counsel. *Id*. at 633, 428 P.2d at 950. The habeas corpus petition was dismissed, with the habeas court making a specific factual finding that Ebersole was advised of his right to counsel and subsequently entered a legally valid guilty plea. *Id.* at 631-32, 428 P.2d at 948-49.

On appeal, Ebersole challenged several of the findings of fact underlying the dismissal of his habeas corpus petition, including the fact that he was advised at his arraignment of his right to be represented by counsel and that his guilty plea was validly entered. *Id.* The Idaho Supreme Court found that the district court judge failed to follow several mandatory statutory requirements in conducting Ebersole's criminal case, resulting in a complete lack of documentation regarding Ebersole's alleged waiver of counsel. *Id.* at 633-34, 428 P.2d at 950-51. The Court held that the

deviation from established rules of procedure resulted in a lack of fundamental fairness, which amounted to a violation of Ebersole's due process rights, and vacated Ebersole's conviction. *Id.* at 636, 428 P.2d at 953.

John Doe asserts that the holding in *Ebersole* applies equally in child protection cases and as a result, the failure to record the last hour of testimony deprived him of the right to an effective presentation on appeal, which violates his due process rights. This argument fails to recognize or address the differences between this case and *Ebersole*. It was not just the lack of a transcript of the proceedings in *Ebersole* that resulted in a due process violation; it was the lack of *any* documentation and the need to resort to parol evidence in an attempt to determine what occurred that constituted the due process violation. As discussed below, the court minutes in this case sufficiently describe the content of the testimony that was not transcribed. Thus, unlike *Ebersole*, this case is not lacking in documentation and there is a sufficient record on appeal.

John Doe also relies on the Idaho Supreme Court's decision in *Matter of Doe I*, 165 Idaho 33, 437 P.3d 33 (2019). In *Matter of Doe I*, the mother argued that her due process rights were violated when on days three and four of the four-day hearing, only one microphone was working and as a result, the court reporter was unable to provide a full transcript. *Id*. at 39, 437 P.3d 39. The mother estimated there were 692 instances where the court reporter failed to transcribe a word or words. *Id*. The mother relied on *Ebersole* as grounds that the judgment terminating parental rights should be set aside. *Id.*

The Court in *Matter of Doe I* found *Ebersole* distinguishable because the record in *Matter of Doe I* included 1225 pages of transcript and, "[d]espite some 'inaudible' words, both the context and meaning of all testimony were preserved within the transcript of the hearing." *Id*. Moreover, the Court noted that the decision in *Ebersole* focused on the lack of a transcript *and* minutes memorializing the arraignment. *Matter of Doe I*, 165 Idaho at 39, 437 P.3d 39. The Court also noted that Idaho Code § 16-2009 requires "[s]tenographic notes or mechanical recording of the hearing." *Matter of Doe I*, 165 Idaho at 39, 437 P.3d 39. The Court concluded that the statutory obligation was satisfied because a transcript was created by the court reporter, and the mother's due process rights were not violated by the recording malfunction. *Id.*

Here, the magistrate court's recording system malfunctioned and failed to record part of the termination hearing. On the first day of the termination trial, there were approximately six hours of testimony; on the second day of trial there was approximately one hour of testimony.

5

Further, in this case, there is significantly more documentation than in *Ebersole* because in addition to a transcript of six of the seven hours of the termination trial, there are also court minutes for all of the testimony, including the hour of untranscribed testimony, that detail the length and the content of the testimony. While, unlike *Matter of Doe I*, this is not a circumstance where there was a transcript of the last hour of testimony with some inaudible words, nonetheless, the content of the untranscribed testimony is clear from the context of the detailed court minutes.

For example, the minutes provide detailed summaries of testimony from Suzanne Buffington, the children's guardian ad litem. The minutes indicate Buffington began testifying at 8:41:28 a.m. and was excused by the magistrate court at 9:10:40 a.m., a total of approximately twenty-nine minutes. Buffington testified that S.E. had "[s]peech issues, tantrums, not potty trained, but always happy. She speaks in full sentences now. She is potty trained. She is not as easily upset. She has table manners. She goes to speech and occupational therapy. She is in school now." Buffington's testimony regarding K.E. is summarized as: "She would flee, jump on furniture, unruly, would speak for other children, frequent night terrors. Also very loving child. She is potty trained. She is precocious for sure. She will test the boundaries but she minds better. She's going to counseling, daycare, and has school there as well." The minutes also summarize Buffington's testimony about J.E.:

> He would jump on furniture. Also in diapers. Unable to understand his speech. He is a little shyer than the other two but he is speaking a lot more. I think that he is getting his voice out a lot more. I can understand him a lot better. He is potty trained now. Speech therapy. Counseling, and schooling.

The minutes provide similar detail of Buffington's testimony regarding the future needs of S.E., K.E., and J.E. The minutes indicate Buffington testified that she felt it would be in the children's best interests to terminate parental rights and that it would be detrimental for the children to remain in foster care.

The minutes also detail testimony from Lisa Summers, a counselor who provided treatment for both John Doe and Jane Doe. Summers' testimony lasted approximately thirty-five minutes, beginning at 9:11:17 a.m. and ending at 9:46:00 a.m. Summers testified that John Doe "is required to do 1 hour of counseling per month. He is only doing the suboxone right now. I believe his admission date was in December. He has been compliant as far as I'm concerned." The minutes indicate Summers testified that John Doe had not had a positive urinalysis since December 2019.

6

The minutes also indicate Summers testified that John Doe's substance abuse issues were serious and she could not guarantee he would not relapse again.

Although John Doe argues the untranscribed testimony is essential to the elements of the case, he does not explain how this testimony is essential to his appeal or which of the factual allegations he would challenge, but cannot due to the lack of a transcript. In *State v. Cheatham*, 139 Idaho 413, 415, 80 P.3d 349, 351 (Ct. App. 2003), this Court stated: "Omissions from a trial transcript warrant a new trial only if the missing portion of the transcript specifically prejudices a defendant's appeal." In *Cheatham*, the defendant challenged the deficiency in his trial transcript because part of the testimony of a forensic scientist who testified for the State was unintelligible and, thus, could not be transcribed. *Id.* Although the trial was stenographically recorded by a court reporter, a different court reporter was appointed to prepare the transcript for appeal, and the original court reporter's stenographic notes were either unavailable or unusable by the new reporter. *Id.*

The defendant argued that the unavailability of a transcript of this testimony deprived him of due process of law and as a result, his conviction should have been set aside. *Id.* This Court held that while the deficiency in the trial transcript was "regrettable," it did not justify setting aside the judgment of conviction. *Id.* Because the defendant did not contend that any error occurred during the untranscribed portion of the trial and he claimed no prejudice, the Court found the assertion of a due process violation was meritless. *Id.*

Like the defendant in *Cheatham*, John Doe does not contend there was any error that occurred during the testimony of either witness. Additionally, John Doe does not explain how the lack of a transcript from the last hour of testimony prejudices him, but instead, argues that this Court is unable to conduct an independent review due to the missing portions of the transcript. This Court is not persuaded. In this case, there are 393 pages in the record, 317 pages of transcript, and approximately 300 pages of exhibits. There is a transcript of six of the seven hours of testimony in the termination trial; all of the testimony is supplemented by detailed court minutes of both the first and the second day of the trial. This is an adequate record for this Court to conduct an independent review and for John Doe to pursue his claims on appeal.

Because the record is sufficient for this Court to conduct an independent review, John Doe has not established a violation of his due process rights.

**B.** **The Magistrate Court Did Not Err When It Held That Doe Neglected His Children and That Termination Is in the Best Interests of the Children**

John Doe challenges the magistrate court's finding that John Doe neglected his children by failing to complete his case plan. John Doe also argues that the magistrate court abused its discretion when it concluded that termination of John Doe's parental rights is in the best interests of the children. The magistrate court's determination that John Doe neglected his children by failing to complete his case plan and by failing to provide proper care and control for his children is supported by substantial and competent evidence, as is the court's determination that termination of John Doe's parental rights is in the best interests of the children.

**1.** **The magistrate court did not err when it found John Doe neglected his children**

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by substantial and competent evidence. *Id.* Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by substantial and competent evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *In re Doe*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

Idaho Code Section 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

The magistrate court terminated John Doe's parental rights on the basis that John Doe neglected his children pursuant to I.C. § 16-2005(1)(b). Idaho Code Section 16-2002(3)(a) defines

"neglect" as any conduct included in I.C. § 16-1602(31). Section 16-1602(31)(a) provides, in pertinent part, that a child is neglected when the child is without proper parental care and control, or subsistence, medical, or other care or control necessary for his or her well-being because of the conduct or omission of his or her parents, guardian, or other custodian or their neglect or refusal to provide them. Neglect also exists where the parent has failed to comply with the court's orders or the case plan in a Child Protective Act case and the Department has had temporary or legal custody of the child for fifteen of the most recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the Department. I.C. § 16-2002(3)(b).

The magistrate court found that John Doe neglected his children because he failed to comply with his court-ordered case plan and because he failed to provide proper care and control for his children. John Doe challenges the magistrate court's finding that he failed to complete his case plan, arguing that he made progress on several tasks in his case plan. John Doe does not challenge the magistrate court's finding that he failed to provide proper care and control and he does not challenge the magistrate court's overall conclusion that he neglected his children. Because Doe does not challenge the alternate basis on which the magistrate court found neglect, this Court affirms the magistrate court's finding that Doe neglected his children by failing to provide proper care and control. *Idaho Dept. of Health and Welfare v. Doe*, 163 Idaho 707, 711, 418 P.3d 1216, 1220 (2016) ("When a judgment is granted on alternative grounds and one of them is not addressed on appeal, we must affirm the judgment."). However, even if John Doe had preserved a challenge to the finding of neglect, it fails on the merits.

The magistrate court's finding of neglect by failing to provide proper care and control is supported by substantial and competent evidence. At the time the children were taken into the care of the Department, John Doe was homeless and living in a filthy van with Jane Doe and the children. John Doe was actively using heroin, methamphetamine, and/or marijuana and he kept drugs and drug paraphernalia in places easily accessible to his children. John Doe's untreated substance abuse impairs his ability to meet his children's basic needs, and he has not demonstrated the ability to maintain sobriety. Similarly, John Doe has not demonstrated the ability to obtain employment or secure a safe and stable residence for himself and his children. The magistrate court found that the homelessness and hazardous environment that plagued John Doe and his family at the onset of the case remained a real and ongoing possibility at the time of trial. Thus,

9

the magistrate court did not err in finding that John Doe neglected his children by failing to provide proper care and control for his children.

The magistrate court's finding that John Doe neglected his children by failing to complete his case plan requirements is similarly supported by substantial and competent evidence. John Doe's case plan required him to obtain a substance abuse evaluation and follow the recommendations for treatment; obtain a mental health evaluation and follow all recommendations made by the provider; attend parenting classes; maintain communication with the Department and attend appointments for his children as deemed appropriate by the Department; obtain and maintain a legal source of income; and obtain safe and stable housing for his children. The magistrate court found that John Doe failed to comply with his case plan because he did not successfully complete any of the tasks in his case plan.

In the fall of 2019, John Doe completed a substance abuse assessment while he was incarcerated and participated in substance abuse treatment from February to June 2020. In June 2020, John Doe stopped attending substance abuse treatment and was discharged from treatment. Following his release from incarceration in December 2020, John Doe resumed substance abuse treatment. During an intake appointment in December 2020, John Doe admitted to relapsing into use of opiates during the summer and fall of 2020. Since resuming treatment, John Doe has complied with all requirements of the treatment facility: he receives a daily dose of methadone and suboxone and provides two urinalyses weekly. All of John Doe's urinalysis results since December 2020 have been negative for any substances other than the prescribed suboxone.

John Doe completed a mental health assessment in March 2020. The assessment recommended protective parenting courses, compliance with the case plan, and individual counseling. John Doe did not participate in individual counseling. John Doe began protective parenting classes in March 2020, but stopped attending in June 2020. Due to his failure to attend, John Doe was formally discharged from protective parenting classes in August 2020. John Doe took steps to re-engage with protective parenting classes in December 2020, but he did not comply with various requirements necessary to restart the class.

John Doe struggled to maintain communication with the Department. John Doe resented that visitation with his children did not increase substantially between February and June 2020. In April 2020, the Department made a referral to Family Connections, a contracted agency that provides supervised visitation, to increase visits between John Doe and his children. Family

10

Connections was able to provide visitation in June 2020. However, John Doe had stopped engaging in his case plan and the Department deemed it unsafe to increase visitation. John Doe has had little interaction with the Department since June 2020. John Doe was invited to attend certain appointments for his children, which he attended. When S.E. required emergency dental surgery in October 2019, John Doe attended the surgery at the hospital. He appeared visibly under the influence of opiates, however, and fell asleep in the hospital waiting room.

At the beginning of 2020, John Doe self-reported that he had a job working for a roofing company, but he did not provide income verification. John Doe has not reported any employment since June 2020. Between October 2019 and February 2020, John Doe was incarcerated. In March 2020, following his release from incarceration, he and Jane Doe obtained housing in the form of a camp trailer. In June 2020, John Doe and Jane Doe moved from the camp trailer and did not inform the Department of their new residence. In October 2020, John Doe was charged with violating probation, and in December 2020 he was arrested and spent several weeks incarcerated. Following John Doe's release from jail, he and Jane Doe moved into the home of Jane Doe's mother; however, the residence was temporary and Jane Doe and John Doe did not have a signed lease for the residence. An officer from the Department visited the residence and found it appropriate for John Doe; however, the Department expressed concern about the volatility of John Doe's relationship with Jane Doe's mother. The Department was also concerned by the ongoing presence of Jane Doe's brother whose criminal history precluded the Department from approving the residence for the children.

The magistrate court found that John Doe did not successfully comply with any of the tasks in his case plan. The evidence supports the magistrate court's conclusion that John Doe failed to comply with his case plan. Although John Doe made some progress relating to the tasks in his case plan, he failed to successfully complete a single assigned task. Thus, the magistrate court's conclusion that John Doe failed to comply with the case plan is supported by substantial and competent evidence.

2. **The magistrate court did not err when it found termination of John Doe's parental rights is in the children's best interests**

John Doe also challenges the magistrate court's determination that termination of his parental rights is in the children's best interests, arguing that he and his children love each other very much and that at the time of trial John Doe's situation was described as stable. Beyond these conclusory statements, John Doe fails to provide any argument or authority on this issue and,

11

therefore, we need not consider it. *Idaho Dep't of Health & Welfare v. Doe (2018-24)*, 164 Idaho 143, 147, 426 P.3d 1243, 1247 (2018). Even if the argument had been preserved, it fails on the merits.

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the children to terminate the parent-child relationship. *In re Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the children's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the children's care after the children are placed in protective custody, the improvement of the children while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *In re Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *In re Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that it is in the best interests of the children to terminate parental rights must still be made upon objective grounds. *In re Doe*, 152 Idaho 953, 956-57, 277 P.3d 400, 403-04 (Ct. App. 2012).

The magistrate court's finding that terminating John Doe's parental rights to S.E., K.E., and J.E. is in the best interests of the children is supported by substantial and competent evidence. At the time of the termination trial, the children had been in the Department's care for sixteen months. Prior to the children's removal from John Doe's and Jane Doe's care, the children were homeless, living in a filthy van with John Doe and Jane Doe, and significantly behind in behavioral, emotional, and physical development. In November 2019, S.E. was moved to a potential pre-adoptive home. K.E. and J.E. were moved into the same pre-adoptive home in December 2019.

When S.E. entered the care of the Department, she was five years old, non-verbal, not toilet trained, and often hid from her foster parents. S.E. had about a two-word vocabulary, threw frequent tantrums, lacked personal boundaries, and suffered from intense night terrors. Shortly after being taken into the Department's care, S.E. required emergency oral surgery to remove an abscessed tooth. Since her placement in foster care, S.E. has been toilet trained, acquired table manners, and speaks in full sentences. S.E. has fewer tantrums and her night terrors have subsided. S.E. was diagnosed as being on the Autism Spectrum and will likely need services for the

remainder of her childhood, including weekly individual counseling, speech and occupational therapy, and an individual education plan at school.

When K.E. and J.E. were first placed in the care of the Department, they were four years old, were not toilet trained, and exhibited "unruly" behavior. K.E. often spoke on behalf of her siblings while J.E. was largely non-verbal and unintelligible when he attempted to speak. K.E. has since been toilet trained and exhibits appropriate behavior. K.E. was diagnosed with Post Traumatic Stress Disorder and attends trauma and play therapy two times a week. She suffers from night terrors, which increase following visitation with John Doe and Jane Doe. Despite K.E.'s struggles, her foster parents describe her as being extremely bright with a strong memory. J.E. has also been toilet trained and has an increased vocabulary. His speech greatly improved with the help of intensive speech therapy, and he will likely need continued speech therapy in the future. J.E. receives weekly counseling. Although J.E. struggles academically, a diagnosis of Autism Spectrum Disorder has been ruled out. J.E. will likely need continued therapy and counseling for many years.

All three children have thrived in foster care and require stable caregivers who can ensure that the many services and appointments the children require are met. John Doe has not shown the ability to meet the needs of his children or provide them with safe and stable housing. He has not adequately addressed his substance abuse addiction and has not pursued treatment for any underlying mental health concerns that may contribute to his addiction. John Doe has not demonstrated an ability to maintain employment and remains essentially homeless. The magistrate court found John Doe had not demonstrated that he would be able to change in the near future and that it would be detrimental to the children to remain in foster care for the indefinite period of time it would take John Doe to address these issues.

The magistrate court recognized the love between John Doe and his children and acknowledged that it would likely be an emotional hardship for the children to lose their legal relationship with their parents. Nonetheless, the magistrate court concluded that the emotional distress the children would suffer from the loss of the legal relationship with their father was far outweighed by the risk of physical and mental harm posed by returning the children into John Doe's care. The magistrate court concluded that if the children were returned to John Doe's care, they would again be subjected to hazardous, unstable living situations and be neglected. The

magistrate court's findings are supported by substantial and competent evidence and thus, the court did not err.

### 3. The magistrate court did not abuse its discretion

John Doe contends the magistrate court abused its discretion by failing to follow the legal standard that requires a presumption in favor of reunification and by failing to adequately consider John Doe's progress on the case plan. John Doe asserts the magistrate court incorrectly believed it was required to either terminate John Doe's rights to the children or return the children to John Doe and Jane Doe immediately following the termination trial.

When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the boundaries of such discretion; (3) acted consistently with any legal standards applicable to the specific choices before it; and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Although the magistrate court did not expressly recognize its decision as one of discretion, "a court is not required to state such standard expressly if the record clearly shows that the court correctly perceived the issue." *Id.* at 867, 421 P.3d at 198. The magistrate court cited the correct legal standard: "Statutory grounds for termination of parental rights are independent, and if any one or more of the grounds for termination are found, termination may be granted." *Roe v. Doe*, 142 Idaho 174, 179, 125 P.3d 530, 535 (2005). The magistrate court continued: "Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship." *In re Doe*, 156 Idaho at 111, 320 P.3d at 1270. The magistrate court noted that: "The best interest analysis takes into account the reality that children need 'stability and certainty.'" *Id.* at 112, 320 P.3d at 1271.

Nothing in the magistrate court's decision indicates that the court did not recognize it had discretion to allow John Doe to maintain his parental rights without returning the children to him the day of the trial. Consistent with the correct legal standards, the magistrate court found that John Doe had not demonstrated the ability to provide basic stability and support for his children and that it would be many years, if ever, before he would be able to achieve that stability. The magistrate court further found it was well past time to provide the children with the certainty, stability, and consistency of an adoptive home. Based on this, the magistrate court recognized it

14

had the discretion to allow the children to remain in foster care while John Doe maintained his parental rights, but found that doing so would be detrimental to the children. Therefore, the magistrate court did not abuse its discretion.

## IV.

## CONCLUSION

John Doe's due process rights were not violated by the malfunction of the magistrate court's recording system. The magistrate court found that John Doe neglected his children on alternate bases, and Doe does not challenge the alternate basis. Consequently, we affirm the magistrate court's finding that John Doe neglected his children by failing to exercise proper parental care and control. The magistrate court's findings that John Doe neglected his children by failing to comply with his case plan and that terminating his parental rights is in the children's best interests are supported by substantial and competent evidence. Accordingly, we affirm the magistrate court's judgment terminating John Doe's parental rights.

Judge GRATTON and Judge BRAILSFORD **CONCUR**.